BARBIERI, Respondent, v. THE GANDOLFO-GHIO
MANUFACTURING COMPANY et al., Appellants.

St. Louis Court of Appeals, April 24, 1906.

MASTER AND SERVANT: Safe Appliances: Physical Facts. In an
action for injuries incurred by plaintiff while operating a knead-
ing machine in defendant's macaroni factory, caused by the
plaintiff's hand being caught between the rollers of the ma-
chine, where the plaintiff testified that the accident was caused
by the lateral jumping of the rollers of the machine in conse-
quence of certain broken cogs, the evidence is examined and it
is *held* that from the position in which the machine was fixed
and the manner in which it worked, the accident could not have
happened in the manner claimed by plaintiff or on account of
the broken cogs, and, *held*, further, the evidence shows the ac-
cident was caused by the plaintiff's own carelessness in bring-
ing his arm in contact with the rollers, which was made pos-
sible by his having removed the guard designed to protect
him against such accidents.

Appeal from St. Louis City Circuit Court.—*Hon. James
R. Kinealy,* Judge.

REVERSED.

*Wise & McNulty* and *Seddon & Holland* for appel-
lant.

*George Safford* and *William Baer* for respondent.

GOODE, J. — The Gandolfo-Ghio Manufacturing
Company is a corporation engaged in the manufacture
of macaroni, spaghetti and other foods of that kind
in the city of St. Louis. The defendant J. B. Gandolfo
is its general manager. Plaintiff Joseph Barbieri had
been working in the factory of the defendant company
some three or four years prior to January 15, 1904, on
which date he sustained a severe injury to one of his
hands while occupied in passing dough through a knead-

ing machine in the factory. This action was instituted to recover damages for that injury.

The grounds of recovery stated in the petition are as follows:

"Plaintiff further states that at and prior to the time plaintiff was injured as aforesaid, the defendants were negligent and careless in that they failed to exercise ordinary care, first, by omitting to inspect said machine; second, by omitting to replace or repair said machine when they knew, or by the exercise of ordinary care, might have known that said machine was in a defective, unsafe and dangerous condition; third, by failing to furnish plaintiff with good and safe machinery; fourth, by instructing plaintiff to use said machinery when they knew, or by the exercise of ordinary care, might have known that it was unsafe and dangerous for him to do so; fifth, by assuring the plaintiff that said machine was in a good and safe condition and would not injure him when they knew, or by the exercise of ordinary care, might have known that said machine was in a defective, unsafe and dangerous condition; and plaintiff states that the negligence and carelessness aforesaid is and was the natural and proximate cause of said injuries.

"Plaintiff further states that at all times herein referred to, said machine and each and every part thereof was worn, bent, crushed and broken and said machine at the time plaintiff was injured, and each and every part thereof, moved with a sudden and unusual motion."

In defense a general denial was pleaded; also contributory negligence on the part of plaintiff in removing from the machine he was operating, a guard which belonged on it and was intended to prevent the hand of the operator from getting between the rollers of the machine, and in operating the machine after the guard was removed. It was further alleged that the condition of the machine in all its particulars was well known

to plaintiff and that he assumed whatever risk there was of being injured by operating it without the guard.

Under the instructions of the court the jury returned a verdict in favor of Gandolfo, but against the Gandolfo-Ghio Manufacturing Company, and judgment having been entered in accordance with the verdict, the company appealed.

To facilitate an understanding of the manner in which the injury was received, it is necessary to understand the construction and operation of the kneading machine and, perhaps, it will not be easy to describe it so that these matters can be understood clearly. In a general way the kneading machine was constructed and used like a clothes wringer; but was much larger and built, in the main, of iron. There were two heavy iron rollers six inches in diameter, one superimposed above the other at a distance which could be controlled by turning a screw. These rollers rotated on axles and the dough to be kneaded was run between them, usually when set about three-fourths of an inch apart. The mass of dough was passed through the rollers fifteen or twenty times until it was thoroughly kneaded. We have not found a statement in the evidence of the height of the rollers above the floor, but from the drift of the testimony we suppose they were about the height of an ordinary table and supported on stanchions or legs. The rollers were about two feet long. In front of them was a wooden trough as wide as the rollers were long, in which the dough was deposited. Behind the rollers was another wooden trough which sloped toward them, forming an inclined plane at a slight angle. The operator stood at one side of the level trough in front of the rollers and, taking a lump of dough about three feet long and one foot and a half wide out of that trough, would throw it over the rollers into the sloping trough behind them, then push it toward the rollers until they, turning inwardly, took hold of it and rolled it between them; discharging it into the trough in front; from

whence it would be taken by the operator again and thrown into the trough behind, and the operation repeated until the requisite kneading was obtained. While Barbieri was working with the machine on the morning in question, his hand got caught between the rollers and was badly mangled. This happened when he was in the act of pushing the dough along the inclined trough to the rollers. The accident was caused, plaintiff contends, by the machinery being in bad repair in particulars which will be stated, and the company contends, by his carelessness in thrusting his fingers between the rollers. The two rollers were each mounted on an axle one inch and a half in diameter, which axles revolved in journal boxes at their ends. These boxes were square and set in a cast-iron frame. The boxes at either end were superimposed one above the other and a screw projected downward through the upper frame. By turning this screw the rollers could be made to separate or approach each other, and thus the distance between them was regulated, metallic plates being inserted between the boxes, when the latter were separated, to hold them firmly in position. The rollers were turned by means of cogwheels. In the factory there was a main driving shaft on which were a loose and a tight pulley, and on these pulleys ran a belt about four inches wide, which could be transferred from one pulley to the other. Attached to one end of this main shaft was a cogwheel eight inches in diameter, which geared or ran into a larger cogwheel about twice that diameter, fastened to the axle or shaft of the lower roller. The rotation of the main shaft by means of the belt caused the cogwheel on the axle of the lower roller to rotate, thereby turning that roller. At the other end of the axle of the lower roller was a cogwheel which worked into another cogwheel at the same end of the axle of the upper roller. The result of this arrangement was that when the belt was shoved from the loose pulley on the tight one, the main shaft was thrown into rotation and the cogwheel on that shaft

working into the cogwheel on the lower roller turned that roller, and the cogwheel on the other end of its axle, turning into the cogwheel on the shaft of the upper roller, caused the latter to rotate, and in this manner both rollers were made to turn inwardly. Two cogs were broken on the eight-inch cogwheel attached to the main shaft which worked into the cogwheel on the axle of the lower roller. The cogs were two inches in depth and two and one-half inches broad. The two that were broken were not broken transversely, but lengthwise. That is, one side of the two cogs was broken off so that only about half the breadth of the cog remained, but that half was of full length. The two broken cogs were separated from each other by six or seven whole cogs. In operating the machine about three cogs meshed at a time with the cogs of the wheel into which they worked. Though the petition alleged other faults in the machine which hurt plaintiff, such as that the cogs were old and worn, there was no testimony to prove it was out of repair in any particular except the two broken cogs, and all the testimony for plaintiff was directed toward proving that those broken teeth were the cause of the injury. The testimony for defendant went to show that the wheel had been in that condition for three or four months and worked as well as if the cogs were whole; that its operation was as smooth and regular as before the cogs were broken; that a skillful mechanic had been called in to repair the wheel or put in a new one, and he said there was no necessity for doing so, as the chipped or broken cogs would not interfere with the working of the kneading machine or render it dangerous. Gandolfo testified to those facts, and so did the machinist who was accustomed to make repairs in the factory. Plaintiff's testimony tended to show the cogs had been broken only three or four days before the accident; that he had called Gandolfo's attention to them and the latter assured him there was no danger in working with them; but that they might be used safely. Plaintiff swore, too, that

Gandolfo said he did not want to stop the machinery and take the time to put on a new wheel which was then in the factory. Plaintiff was the foreman of the second floor of the factory where the machine which hurt him was stationed. It was his business to look after the men on that floor and he had a general over-sight of the conduct of the business there. He said: "I was supposed to look after everything — I had charge of everything — supposed to be — everything that was going on." Plaintiff swore that the machine ran smoothly before the cog was broken, but that afterwards it made a different sound — a noise. He swore he was hurt by his hand catching between the rollers, and testified that the accident occurred in this manner:

"Q. What did the roller do just at the time it caught your hand? A. It was making jumps, and that way, that jump, this way (indicating) he was making jump on account of the other two teeth broken on the cogwheel, and at the same time he make the jump he caught my hand."

Plaintiff spoke English brokenly and therefore his testimony is not connected.

The court struck out the statement that the roller jumped on account of the broken cogwheel.

Plaintiff then testified that he had worked on the machine three years, was perfectly familiar with it and understood machines of that kind and that this one never jumped before the cogs were broken. He then testified:

"Q. Now, did you ever notice where these broken parts were at the time the machine jumped? A. Well, the little wheel, when the cogwheel, the little wheel and the big wheel was coming, turning, one turned one side and the other turned on the other side; and when the big wheel— these two teeth were broken and that made it jump.

"Q. In other words, when the wheel came around to

where the teeth were broken out, then it jumped? A. Yes, sir."

The witness then testified that he was foreman on that floor and was accustomed to work at any of the machines, including the one which hurt him. He then gave the following testimony regarding the accident:

"Q. I want you to describe to the jury just what you mean by making a jump? A. It was making a jump because on account of the little gear wheel had two teeth broken.

"Q. What do you mean when you say the wheel [sic] jumped; how did it jump; what did it do? A. It jumped; it was making a jump like that (indicating by moving his hand horizontally) and my hands was this way (indicating) and it caught my hand and pull him away down.

"Q. In other words, you mean the two rollers moved toward your hand? A. Yes, sir.

"Q. Mr. Barbieri, then, so as to get this in the record, I will ask you which way the roller jumped; which way it moved? A. One roller turn this way (indicating) and go around this way (indicating) like a wringer; and at the time there was a strike, them two teeth was broken on the cogwheel; at the same time it was strike them two teeth broke, the roller, was making a jump. I had my hand this way (indicating) to put them dough through the roller; that makes the time he did, then it caught my hands and pull away through."

On cross-examination plaintiff testified as follows:

"Q. Do you mean to say that when the thing went around — these two wheels went around and got to the point where the two teeth were broken, that those axles jumped out of their sockets? A. No, sir; I don't mean that — they made a jump — the roller when he started to run, run with a piece of dough under, and move like that (indicating).

"Q. It wobbled like; it shook? A. Yes, sir; that make a jump where the two teeth were broke."

During the progress of the trial while counsel for defendant was endeavoring to show by an expert witness that it would be impossible for the rollers to jump out of their sockets and catch plaintiff's hand, plaintiff's counsel said: "We have not offered evidence showing that; nor have we alleged that the rollers jumped out of their sockets." The position this machine occupied in the factory caused the operator to stand on the south side of the rollers and throw the dough over them to the inclined table on the north side. The operator then reached over the top of the rollers and with his hand shoved the lump of dough toward them until they took hold of it. Projecting northwardly from just above the top of the rollers, was a slanting guard or board seven or eight inches wide, running the full length of the rollers and fastened in position. The purpose of this guard was to prevent the operator, when he reached over the rollers to shove the dough toward them, from thrusting his hand so far down that it would get caught. The testimony would support the conclusion that the guard served to catch the arm or wrist and thereby prevent the hand of a man of ordinary height, with an arm of ordinary length, from coming closer than ten inches from the rollers. Such was the testimony for the defendant as given by the general manager, the machinist who was accustomed to make repairs in the factory, and an expert mechanical engineer. Plaintiff testified that the guard, though intended for the protection of employees, increased, instead of diminishing the danger, by hiding the operator's hand from his sight as he was shoving the dough, so that he could not see how close his hand came to the rollers. Just before plaintiff went to work on the morning of the injury, this guard was knocked off the machine by a workman under plaintiff's immediate observation, and though plaintiff does not admit that he ordered it removed, it is obvious from his testimony that it was removed with his consent. After the

guard was gone plaintiff ran a piece of dough through the rollers twice, and it was during the third act of kneading that his hand was caught. In regard to the necessity of pushing the dough and the protection afforded by the guard, plaintiff testified as follows:

"Q. How near to the rollers did you have to put your hand to push it through? A. That depend on what kind of dough you got — when you started it you know you ain't got no dough because in the night you finish all that dough.

"Q. I am talking about this dough you were working with then. How close to the roller did you have to put your finger, with that piece of dough? A. You had to put your finger close to the roller, as far as you can make the dough go under the roller.

"Q. How close would you get it to the roller? A. How close would you get it to the roller?

"Q. How near would you have to get your finger to the roller? A. Well, you got to get your finger under the roller to make the dough pass under the roller.

"Q. You don't have to get your finger between the rollers? A. Would you like to put your finger between the roller?

"Q. That is what I am asking you. Now, if the guard is on that machine, and your are standing at the usual place, you can't put yur finger near the roller, can you? A. If the guard is on?

"Q. Yes. A. You got to put your hand away under the board to see if the dough stick to the roller.

"Q. If you put your hand over that guard and try to put it under, you can't get your fingers within six inches of the roller, can you? A. I don't understand that question.

"Q. I say, if you stand there, when the guard is on, and put your hand over the guard — A. (interrupting), Yes, sir.

"Q. (continuing) — when the guard is on you can't get your fingers in between the rollers? A. How can

you see the dough if you stoop over like that (indicating).

"Q.  I say, if the guard is on, and you want to feed the dough — the guard is on there — and you are standing in the usual place, and you put your arm around, and your hand down over the guard, you can't get your finger into the roller — when the guard is on? A.  You got to get your finger under there to make the dough pass through.

"Q.  You can't do that when the guard is on?  A. You have to do it.

"Q.  When the guard is on?  A.  Yes, sir.

"Q.  Well, you can't get your finger all the way to the rollers when the guard is on?  A.  You got to get your finger down, as far as, enough to pass the dough through, and at the same time the guard is on there, you don't know whether the roller caught your finger or not; you can't see whether your hand go there or not.

"Q.  But before that, during all the time you were down there, and during all the time when you worked that machine before, you worked it with the guard on? A.  Yes, sir.

"Q.  And this is the first time that you ever worked it with the guard off?  A.  Yes, sir.

"Q.  Now then, during these other years that you worked there, with the guard on, you would push the dough, would you, to make it go through?  A.  Yes, sir.

"Q.  And it would always go through when you pushed it?  A.  Yes, sir."

The guard had been on the machine continuously for several years until it was removed just before the accident.

Gandolfo, the general manager, testified as follows:

"Q.  Just state the purpose of the guard; what is the purpose of it; what is it put there for?  A.  So that his (the operator's) left hand will come within ten inches of the roller and he can't hurt it."

The machinist who kept the machinery in the factory in order, testified that nearly one-half of each of the broken teeth was gone and those teeth were five or six cogs apart. He then testified in regard to the effect of the broken teeth as follows:

"Q. Now state what your opinion was as to the effect of breaks of this kind upon the running of the machine? A. It didn't have any effect, that I could see, on the wheel. . . .

"Q. Were there enough of each of these cogs left to catch the other wheel? A. The next cog to it is enough to catch it, even if it was all out.

"Q. How many cogs caught at once on the little wheel or the big wheel? A. Very nearly three cogs."

This machinist had examined the broken teeth about six weeks before the accident and pronounced the machine safe with them in that condition. He examined them again on the afternoon of the accident after it occurred, and found them in the same condition they were before; that is, no more broken than before. He swore that the machine worked as well with them broken as if they were whole. This witness testified further:

"Q. Now state how these rollers are fastened there in place. These two rollers? A. They got a kind of a housing casting where the two set in; they are in boxes on both sides. The bottom one sets down and between there is a rubber, between the two rollers, and on the top there is a screw that holds the top box down.

"Q. State whether or not in your opinion, these chips out of these cogs, could cause any jump of the rollers out of their axis, or out of their place? A. Not unless there is a break or something.

"Q. What do you mean by that? A. They would have to break the boxes or housing.

"Q. If the machine is running along with these two pieces out, that would have no effect to make the roller jump? A. There is a flywheel on it that keeps it in steady motion. It couldn't possibly jump.

"Q. How long have you been in the machinery business, making and repairing machinery? A. Well, I have been in it all my life; I have just been steady the last five years; I wasn't steady at it until the last five years; I was steady at it the last five years."

John H. Kinealy, who qualified as a mechanical engineer, having taken a university course in that science and written treatises on it afterwards, testified regarding the construction of the machine and the effect of the broken teeth, as follows:

"Now, Professor, assuming in that smaller cogwheel, there were two teeth — six or seven teeth apart — just look at this shadow mark (indicating) only at that part in the circle, the other part has nothing to do with it, at that part there 'A B;' assuming that that letter A represents the cog —that the part of it marked A represents that part intact, and B represents the part broken out (referring to diagram marked 'Exhibit X'), and that condition existed in two of the teeth of this cogwheel, and the two broken ones were separated by six or seven cogs, will you state whether the presence of these chips or broken pieces would, in your opinion, cause the rollers to jump, to get out of their sockets, or jump in any way? A. No, sir; there would be no such effect; there would be nothing to make the wheels jump, or to make them run differently from what they had run before these small pieces had been broken off.

"Q. State whether or not, in your opinion, such pieces broken out— with such pieces broken out the machine would run in its normal fashion, as far as the movement of the rollers is concerned? A. Yes, sir; the machine would run to all appearances, normally, just as though there had been no break.

"Q. Would it be possible, in your opinion, for any reason, or owing to any cause, for these rollers — while the machine is running there — to jump out of their sockets, jump forward and catch a man's hand? A. No, sir."

The witness further testified as to the guard on the machine:

"Q.  Now, Professor, if a man stands to the south of that machine — the slanting table is at the north, and the straight one is at the south — if a man stands here by that plank L; you notice that mark 'L'?    A. Yes, sir.

"Q.  (continuing) and reaches over the roller and the guard and places his finger at the edge of the guard, how far will his finger be from the point where the two rollers underneath there are opposite each other?    A. About eight inches."

This witness gave testimony that if a piece of iron broke off and caught in the cogs as they revolved, it would cause a jerk or jump and something would have to break if there was not room between the cogs.

The foregoing is the substance of the testimony in the case apart from that referring to the extent of the injuries plaintiff received.  A study of it has convinced us that the broken teeth in the small cogwheel could not have been the cause of the accident.  It was practically admitted during the trial that those teeth could not make the rollers jump so that the ends of their shafts would be thrown out of their iron sockets.  The ends of the shafts were fixed in the boxes and it would be impossible for them to jump forward without bursting the boxes, which did not happen.  If they could not have jumped forward, it is inconceivable how they could have caught plaintiff's hand unless he had placed it against them.  In truth, there was no evidence whatever that the broken teeth could have made the rollers approach plaintiff's hand while he was pushing the dough toward them.  Plaintiff's counsel tried to prove by one witness that if a broken piece of iron happened to lodge between the cogwheels which worked into each other, a jarring or jumping motion would be given to the shaft.  But there was no evidence that a piece of iron caught in the cogs at the time plaintiff was hurt.  Such testimony could

have had no relevancy to the case on the allegations of the petition, except on the theory that one of the pieces broken out of the two cogs had interfered with the turning of the wheels, or that, by reason of the teeth being broken, another piece had chipped off and thereby caused the rollers to jump. This was pure guesswork, and it was guesswork which positive testimony refuted. The machinist swore the broken cogs were in exactly the same condition after the accident that they were in when he examined them weeks before. We cannot perceive how those two cogs, separated from each other by six or seven other cogs, could have had any effect on the turning of the rollers; and all the evidence except plaintiff's goes to show they could not have had any. He swore that his hand was caught by the rollers jumping on account of the broken teeth. For the accident to have occurred in that manner, the rollers would have had to jump forward to his hand; and this was shown to be physically impossible. In truth plaintiff and his counsel disclaimed that theory. The guard plaintiff permitted or directed to be removed, was designed to protect the operator from just such an accident as the one which occurred. Immediately after its removal plaintiff got hurt, though he had worked on the machine for three or four years with the guard on, without getting hurt. An attempt was made to show that he was blameless in removing the guard, he testifying that it did not make for safety; testimony which every other witness disputed. Great caution ought to be observed in holding an employer responsible for injury to an employee received just after the latter has detached some safeguard intended for his protection, which he preferred not to use. It looks like plaintiff's hand could not have been caught with the guard on. But we rest the decision on the proved impossibility of the rollers jumping toward plaintiff's hand. In our judgment the evidence shows beyond doubt that plaintiff received his injury in conse-

quence of his own carelessness in bringing his arm in contact with the rollers; an act due to his having removed the guard, thus making it possible to reach further toward the rollers, or due to inattention.   We think the machine's safety was not impaired by the broken teeth and that if it was, the injury did not result from that fault.   Therefore the judgment will be reversed. All concur.